GEO. W. ANDERSON *vs.* N. W. TAYLOR & HUGH DOUGLASS.

OCTOBER Term, 1873.

EXECUTION—LEVY ON LAND—TESTE.—The levy of an execution on land gives a specific lien, independent of the lien of the judgment, and relates back to the teste of the execution so as to override intermediate conveyances between the teste and the levy.

SAME—DELAY.—A delay to sell, under the levy, at the instance of the judgment-debtors, will not prejudice the lien thus acquired as between the creditor and the debtors, or the assignees of notes given by one of those debtors to the other for the land, the notes having been assigned as collateral security or in part payment of a pre-existing debt.

HE WHO ASKS EQUITY MUST DO EQUITY.—But the judgment-creditor having come into this court for equity must do equity, and will only be entitled to the land to the extent of his debt, the assignee taking the surplus.

*Jno. M. Gaut*, for Anderson.

*H. E. Jones*, for Morton.

THE CHANCELLOR:—In this case, in the decision of the rights of Anderson and Douglass on the one side and Jones and Morton on the other, two questions were held up for further argument:

1. Whether the levy of an execution on land during the existence of the judgment-lien under the Code, §§ 2,980, 2,982, gives the judgment-creditor a specific lien which may survive the lien of the judgment, and, if so, whether this execution lien relates back to the teste of the execution.

2. Whether such lien, in this case, if it be held to have been acquired, has been lost by laches, so as to let in the rights of Anderson and Douglass.

Very able arguments in writing have been submitted by the learned counsel for the respective parties. Neither counsel has succeeded, however, in finding authorities so to the point, or reasons so clear as to remove all doubt. The gravest objection to the suggestion of the court upon the first point is the silence of the courts and profession, a weighty objection it must be admitted, but not conclusive by reason of the fact that the lien of the judgment has overshadowed, and rendered unnecessary a resort to the lien of the execution in all of our reported cases where the latter might have been relied on. No case has been found by either of the counsel or myself where, upon the facts given, the decision would have been different if the execution lien as contended for had been conceded to exist.

One reason, doubtless, which tended to obscure the execution lien, if it existed, was the wording of the act of 1,799, 14, 2, limiting the judgment lien. "No execution on land shall be levied, it says, or sale of lands or tenements shall be made, which may affect the title of any person purchasing *bona fide* from, through or under a defendant in any judg-

ment, unless such execution shall be issued, and levied on such land, and sale thereof made in twelve months from the time of said judgment being rendered, and every sale of lands or tenements under execution made contrary to the provisions of the act shall be null and void to all intents and purposes." This language is broad, and would seem intended to prevent an execution levy from being effectual at all unless a sale should take place under it within the twelve months of the judgment lien. But this was not the construction put upon the statute by the courts, nor, as we all know, by the profession and the public in actual practice. That a levy of an execution after the expiration of the judgment lien, is a specific lien itself, of which all persons are bound to take notice, as a *lis pendens*, has never been questioned, although the learned counsel of the complainant seems to think that no such lien exists at all in this state. Even in *Bagley* v. *Ward*, 37 Cal. 121, upon which he relies to show that no execution lien exists pending the continuance of the judgment lien (which is for two years in that state), the court expressly held that where there is no judgment lien the levy of an execution operates upon real property as it does upon personal property—that is, according to California law, the execution first served has priority.

It was held at an early day by our courts that the levy of the execution on land was a specific lien and *lis pendens*, which was notice to all the world, and that no person could be a *bona fide* purchaser within the meaning of the act of 1799, after such lien had attached, unless it was lost by the act of the judgment-creditor. The language of the court in *Overton* v. *Perkins*, Mar. & Yer. 370, a decision as often cited as any in our books to this day as good law, is clear upon the point : "Whilst an execution or order of sale," the court say, "is in the hands of the sheriff, levied upon lands, although more than one year from the rendition of the judgment, no sale of the land can be made by the debtor to defeat such levy, aside from any negligence on the part of the creditor ; such purchaser would not be a *bona fide* pur-

chaser within the meaning of the act of 1799, 14, because he would be presumed to know of the existence of the execution and its levy." In this case, the lien of the execution by levy within the year of the judgment lien, is clearly recognized: "When the execution," the court say, "is levied upon some particular parcel (of land), *this is fixed with the lien after the year*," p. 374. The same distinction between the judgment lien and the execution lien is taken in *Miller* v. *Estill*, 8 Yer. 460 : "There is," say the court, "a wide difference between the general lien of a judgment on all the debtor's land, and a special and fixed lien by virtue of a levy. The latter is the inception of a right to satisfaction that cannot be defeated but by the act of the creditor himself, not by the act of the debtor conveying to a third person." This language is cited with approval in *Boggess* v. *Gamble*, 3 Cold. 153. And in *Taylor* v. *Mumford*, 3 Hum. 66, in a contest between execution-creditors over the proceeds of land sold under a *fi fa.*, and a *venditioni exponas* tested as of the same term, it was held that the latter was entitled to be first satisfied, because it related to the levy of the *fi. fa.* previous to the term.

If the levy of an execution on land gives a lien, there is no sound reason, as it seems to me, why the lien should not relate to the teste of the execution, as it unquestionably does in the case of personality. The *fieri facias* having been directed by the act of Geo. II, followed by the North Carolina act of 1777, to run against land, as well as goods and chattels, it would seem necessarily to follow, unless otherwise expressly provided, that the writ would affect land in all respects as it affects personalty. The concession of a general lien to the judgment would not necessarily take away the execution lien. Such a result would be contrary to all analogy. Nor is there anything in the decisions to countenance such a conclusion. On the contrary, the cases of *Overton* v. *Perkins*, Mar. & Yer. 370, and *Miller* v. *Estill*, 8 Yer. 460, are expressly based on the existence of the lien, because they hold that such a lien is not affected by an

injunction, whereas, the lien of the judgment would be lost by the continuance of the injunction beyond the twelve months, and *Overton* v. *Perkins*, 10 Yer. 328, 333, is to the same effect.

The North Carolina cases, as we learn from Judge Peck in *Hickman* v. *Murfree*, Mar. & Yer. 35, take for granted that an injunction binds *lands from the teste*, and that an alias pursued after the return of the first execution continues the lien thus acquired, without an actual levy.

The Code, §§ 2,980, 2,982, modifies the language of 1799, 14, and conforms to the decisions.

Whatever, therefore, may be the ruling in other states upon their statutes, the practice in this state, following in this respect the analogy of the English decisions upon the writ of *elegit*, and the North Carolina cases upon the writ of *fieri facias*, is that the levy of an execution on land gives a specific lien, independent of the general lien of the judgment, and such lien, I must think, upon sound principle and in accord with the rule as to personalty, relates to the teste of the execution.

The other question reserved was whether this lien has been lost, as all the authorities agree it may be, by the act of the judgment-creditor in favor of Anderson and Douglass.

The facts are peculiar; Morton's judgment was recovered at the April term, 1868, of the U. S. Circuit Court, and is against both, N. W. and W. J. Taylor. Execution issued on the 30th of July, 1868, and was levied on the 16th of October, the levy, upon the principle just stated, relating back at least to the date of the judgment. On the 19th of August, 1868, W. J. Taylor, who then owned the land in controversy, sold it to N. W. Taylor for $5,000, taking his notes at one, two and three years for the purchase-money. One of these notes was transferred by him to Douglass as collateral security for a pre-existing debt, and the other two, on the day of the sale, he endorsed, with the lien retained in the deed for the payment of the purchase-money, to J. Bloomstein in satisfaction, according to the weight of

testimony, of a pre-existing debt. Afterwards, on the 23d of June, 1869, Bloomstein delivered the notes, without endorsement, to Anderson in part payment of a tract of land. Morton issued his *vend. ex.* on the 1st of July, and sold the land on the 16th day of August, 1869.

The weight of evidence is that neither Bloomstein, Anderson nor Douglass had actual notice of Morton's judgment or execution. The struggle, therefore, so far as they are concerned, is between Morton and them as equally meritorious creditors, and, in the absence of a controlling equity, must turn upon their respective legal rights. The Taylors, of course, knew of the judgment, and probably that the execution was in the Marshal's hands. The other parties named had constructive notice of the facts. Under these circumstances, there cannot be a particle of doubt that if Morton had pursued his legal rights, his would have been the better right. Instead of doing this, however, he directed the marshal, by writing on the back of the execution on the 18th of October, 1868, "to hold up until further order," and took no step until the 1st of July following. The delay was at the instance of the Taylors, and they cannot, of course, complain, or insist that the lien has been lost by laches. Do Anderson and Douglass stand in any better situation? If the Taylors had conveyed the *land* to an innocent third person, either by way of sale or mortgage, the purchaser would probably, in analogy to the ruling in regard to the judgment lien, have acquired a good title. *Dickinson* v. *Collins*, 1 Sneed, 576. This would be clearly so, unless there is a distinction between the general lien of the judgment and the specific lien by levy of the execution in such cases. For, the indefinite delay created by the written direction to suspend all further proceedings, and the actual suspension for more than the period between two terms of the Ú. S. Court, would let in junior judgment-creditors, and probably *bona fide* purchasers, for value and without actual notice. Bump on Fraud. Conv. 496, 497, and cases cited.

But the land itself was not sold and conveyed by the Tay-

lors. Anderson and Douglass are only holders of the notes given for the purchase-money by one of the Taylors to the other, and holders, the one as security, the other as payment of a pre-existing debt. If W. J. Taylor had retained these notes until the sale under Morton's execution had been made, it would scarcely be contended that a subsequent assignee of the note as security, or in payment of the pre-existing debt, could enforce it against the purchaser at such judicial sale. And if such an assignee could not enforce the note under these circumstances, it seems that he is in no better situation under a similar transfer made before the sale. It is the settled doctrine of this state, that the indorsee of a note in satisfaction of a pre-existing debt, and *a fortiori* if he takes it as collateral security, is not a holder for value and in due course of trade. *Rhea* v. *Allison*, 3 Head. 176 ; *Wormley* v. *Lowry*, 1 Hum. 408 ; *King* v. *Doolittle*, 1 Head. 77. It is true, this rule is usually applied to equities existing between the makers and original payee of the paper. But the doctrine has been extended to a struggle between a judgment-creditor and the assignee of the notes given upon a fraudulent mortgage of property. Bump on Fraud. Conv. 483, citing *Johnston* v. *Dick*, 27 Miss. 277, and *Davis* v. *Gibbon*, 24 Iowa, 257. So, in New York, under a statute which protects the title of a *bona fide* purchaser made before actual levy of an execution, it has been always held that the mortgagee or assignee of personal property to secure the payment of a pre-existing debt, is not entitled to preference over an execution previously in the hands of the sheriff to be executed, although then not actually levied. *Slade* v. *Van Vechten*, 11 Paige, 21 ; *Warner* v. *Paine*, 3 Barb. Ch. 630 ; *Matter of Howe*, 1 Paige, 125. And it is also well settled that even a conveyance of land in payment of a pre-existing debt does not put the grantee in the position of a purchaser for value, nor entitle him to the protection of a court of equity as against prior equities. 3 Head. 719 ; 4 Paige, 215.

My opinion is that as between Morton and the Taylors the former acquired a right by virtue of the levy on the 16th of

October, 1868, which was not lost by the subsequent delay, that delay having been granted the Taylors at their own request, and which was perfected by the subsequent sale; and that Anderson and Douglass acquired only an equity by the transfer of the notes of N. W. Taylor, which must yield to to the prior equity of the judgment-creditor.

But inasmuch as Morton comes into this court for equitable relief, without relying at law upon his strict legal right, he must do equity, and the land will be only held as a security for the money due him, and the surplus will go under the transfers to Anderson and Douglass. An account will be ordered to ascertain the amount due to Morton, and if Anderson and Douglass choose to pay this amount thus found and costs they may do so, and control the land. If not, the land will be sold, and the proceeds applied first to the payment of the balance due Morton, and the residue to the satisfaction of the debts of Anderson and Douglass; any surplus to W. J. Taylor. The costs of Morton's proceedings in this contingency will be paid by him in the first instance, and he may have his decree against the defendant Taylor for the same, to be paid out of any proceeds of the sale which may be going to him.