FRANK P. BRAUCH, Appellee, v. H. H. FREKING et al., Appellants.

HENRY P. BRAUCH, Appellee, v. H. H. FREKING et al., Appellants.

Nos. 42502, 42503.

FEBRUARY 12, 1935.

Herbert S. Martin and R. G. Rodman, for appellants.

Roseberry & Roseberry and John T. Keenan, for appellees.

HAMILTON, J.—On March 1, 1929, H. H. Freking and wife, Mary E. Freking, signed a promissory note in the sum of $3,800, payable to Frank P. Brauch, and to secure the payment of said note on the same date executed a mortgage upon their homestead property in the city of LeMars, Iowa, described as follows:

"Lot Five (5), in Block Seventy-nine (79) Fifth addition to the city of LeMars, Plymouth county, Iowa."

That this property was the homestead of mortgagors is conceded by the parties and also established by the evidence. This mortgage was not filed for record until September 22, 1931. The money was borrowed from, and all negotiations in reference thereto were had with, Anna A. Brauch, sister of appellees; she being a notary public and transacting all the business. At the request of Anna A. Brauch, the note and mortgage were made out in the name of her brother, Frank P. Brauch, which was consented to by the borrowers; the reason given for this being that she as notary public could not take the acknowledgment of the mortgage in which she was named as mortgagee. This note and mortgage are the basis

of the suit brought by appellee Frank P. Brauch, being designated in the record as equity cause No. 15818.

On February 28, 1931, H. H. Freking and wife, Mary E. Freking, signed a promissory note for $25,000, payable to Henry P. Brauch, and on the 5th day of March, 1931, signed and acknowledged a mortgage to secure the same on two hundred forty acres of land owned by H. H. Freking and described as follows:

"The Northeast quarter (NE¼) and North half (N½) of the Southeast quarter (SE¼) of Section Fourteen (14), Township Ninety-two (92), North, Range Forty-five (45) West of the 5th P. M., in Plymouth County, Iowa."

This mortgage bears date of February 28, 1931, but was not signed and acknowledged until March 5, 1931, and it was on this later date, according to the record, that the note and mortgage were delivered and $10,000 of the consideration paid. The balance of $15,000 represented a pre-existing indebtedness. This mortgage was acknowledged before a Mr. Conway, a notary public, but the papers were drawn up by Anna Brauch; the mortgage was not filed for record until September 25, 1931. This $25,000 note and mortgage are the basis of the suit brought by appellee Henry P. Brauch, and which suit is designated in the record as equity cause No. 15819.

The claim of appellant August Kilker arose out of the following transactions: About the year 1920, Anna Kilker, through her husband, William Kilker, loaned to Henry H. Freking (sometimes referred to in the record as H. H. Freking and Henry Freking) $2,000 on his personal note, and in 1923 a second loan was made of $2,000 additional, and at that time a new note for the full amount of $4,000 was taken. The note was payable to Anna Kilker. It was due one year after date, but was allowed to run on until the spring of 1931. In the month of January, 1931, Anna Kilker died, and shortly thereafter William Kilker, desiring to settle his wife's estate, asked Mr. Freking to pay his note, and, when told by Mr. Freking that he did not have the money and would have to borrow it, William Kilker suggested to Mr. Freking that he might borrow the money from his brother, August Kilker, one of the defendants and the appellant in this case, and it appears that William Kilker also spoke to his brother, August Kilker, about making a loan to

Mr. Freking, so that Mr. Freking would be able to pay the indebtedness due the estate of Anna Kilker.

August Kilker testified: "Will Kilker said that Freking wanted to borrow it." It appears that Mr. Freking rode down town with Will Kilker to see his brother, August, in reference to this loan, and they had some talk on the street. August Kilker inquired of Mr. Freking about his financial condition, and August testified that Freking told him that "he was always a little in debt", and there was a little debt on one 80, but the other place was clear. He did not ask Freking how much he was behind or whom he owed, nor did he demand of him a property statement of any kind, and there is no evidence in the record that he ever made any inquiry of any one concerning the financial standing of Mr. Freking, except to have the record in the recorder's office examined to ascertain whether there were any other liens against this property, and, finding none, he made the loan of $4,000. August Kilker, together with Arthur Kilker, son of William Kilker, acting for his father, went to the home of Mr. and Mrs. Freking to consummate the loan. There August turned over to Arthur the $4,000 in settlement of the note which was due the estate of Anna Kilker, and Arthur delivered to Freking the old note, and Freking and his wife executed and delivered to August a note in the sum of $4,000. This was on the second day of March, 1931, three days before the execution of the $25,000 note and mortgage given to Henry P. Brauch upon the two hundred forty-acre farm.

It should be stated that, before the completion of the negotiations for the loan of $4,000 by August Kilker to Mr. Freking, Mr. Freking attempted to borrow the money of Anna A. Brauch. She informed him that she did not have the money, and, when Freking told her that he could probably get the money from August Kilker, she said to him that he "should get it from him". In addition to the indebtedness hereinbefore referred to, Mr. Freking was indebted to Anna Brauch on another personal note in the sum of $1,300. About September, 1931, for some reason not clearly disclosed by the record, August Kilker asked for security on his $4,000 note. Freking said he was willing to give him a second mortgage on the two hundred forty-acre farm. It appears that this was the first information that August Kilker had that there was a mortgage on the two hundred forty acres. Freking talked over with Anna Brauch this matter of giving a second mortgage to August Kilker, and

Anna, having an unsecured note of $1,300, was not willing that Freking should give August Kilker a second mortgage, but demanded one to secure her $1,300 note, and there commenced a race between these two creditors, which resulted in the litigation now before this court. Freking did not give either of them a second mortgage.

Anna Brauch sued on her $1,300 note, and, before she could get judgment, August Kilker, through his attorneys, rushed in and obtained a confession of judgment upon his $4,000 note from H. H. Freking and Mary E. Freking, bearing date of February 26, 1932, and filed the same for record, and judgment was entered thereon, and this judgment is the basis of the cause of action set out in the cross-petition of August Kilker, his claim being that the lien of his judgment is superior to the mortgage lien of appellees, alleging in his cross-petition the facts which he claims constitute an equitable estoppel against the appellees; alleging that said mortgages of appellees were withheld from the record by Anna A. Brauch at the request of the defendant H. H. Freking, and for the purpose of giving him a false credit standing and of enabling him to negotiate and consummate the said loan of $4,000 with the defendant August Kilker, and that said defendant never had any actual knowledge or notice of any of said mortgages until on or about the month of September, 1931, and that, had the defendant August Kilker known of the existence of said mortgages prior to the making of the loan to the defendants H. H. Freking and Mary E. Freking, he would not have made the same, and that the plaintiffs and Anna A. Brauch should be and are estopped from alleging the mortgages sued on in this action are liens upon the premises involved in this action prior to the lien of the judgment of said answering defendant. Said cross-petition further alleges that the $3,800 mortgage is void because the acknowledgment was taken before Anna Brauch, who is alleged to be the real party in interest. He also pleads that the plaintiffs cannot maintain the action, because they are not the real parties in interest, alleging that Anna A. Brauch in fact made the loans and furnished the money, and was, and is, the real party in interest. He further pleads that the $4,000 was furnished to pay off a debt which antedated the acquisition of the homestead, and that therefore his judgment should be declared a lien upon said homestead property prior and superior to the lien of appellee's mortgage. Practically the same allegations

are set forth in the answer and cross-petition filed in each of the said actions.

To this cross-petition the plaintiffs filed a reply, denying the allegations of the cross-petition with reference to estoppel, denying specifically that the lien of August Kilker was prior and superior to the lien of appellees' mortgages, and specifically denying that August Kilker had any lien on the real estate constituting the homestead of the defendants H. H. Freking and Mary E. Freking, and specifically denying that the appellees are not the real parties in interest and alleging that they own and hold the legal title to the written instruments of indebtedness sued on, and that they are the proper parties to the cause of action; and they specifically deny that they withheld from the record the mortgages sued on for the purpose of deceiving the defendant August Kilker or any other person whomsoever, or that there was any agreement or arrangement to withhold the same from record, and they specifically deny that they had any knowledge of the fact that the defendant August Kilker was relying in any way upon the possession of the homestead as security for the payment of any obligations from H. H. Freking and Mary E. Freking. They specifically allege that August Kilker knew that said premises were homestead premises and that he could not resort to the same for the collection of any indebtedness from the said H. H. Freking and Mary E. Freking, or either of them, and that he was not deceived because said homestead premises did not show by recording at any time the mortgage sued on by the plaintiff Frank P. Brauch in his petition.

The lower court found for the plaintiff in each of said actions, and rendered judgment on their respective notes and decree foreclosing the mortgage in each case and dismissing defendant's cross-petition. We have gone over the evidence very carefully and examined the authorities cited in the briefs and arguments of both appellant and appellees, and the court is abidingly satisfied that the decision of the lower court is correct. The errors relied upon for reversal are: (1) That the court erred in holding that the plaintiffs, Frank P. Brauch and Henry P. Brauch, and the defendant Anna A. Brauch were not estopped from alleging that the mortgages sued upon were liens upon the premises involved prior and superior to the lien of the judgment of the said August Kilker against the Frekings; (2) that the court erred in failing to grant to August Kilker the relief prayed for in his amended and substituted answer

and cross-petition; (3) that the court erred in finding for the plaintiffs, and in giving them any relief, particularly in giving them the relief asked for; (4) that the plaintiffs were not entitled to the relief asked by them nor to the relief awarded by the court.

Taking up first the question of estoppel, we find that the only allegations of the cross-petition upon which estoppel is based that have any support in the record are (1) the bare fact that the respective mortgages of the appellees were withheld from the record and not recorded until September, 1931, and (2) the one lone item of testimony that Anna A. Brauch had knowledge of the fact that Mr. Freking was about to borrow of the appellant August Kilker the sum of $4,000 with which to liquidate a prior indebtedness owing to Mrs. Anna Kilker. There is not a particle of evidence in the record that Anna A. Brauch or her brothers, the plaintiffs and appellees, withheld their mortgages from the record for the purpose of deceiving the appellant, or inducing him to make the loan of the $4,000. The record does not reveal that there was ever a word spoken between either of the plaintiffs or Anna A. Brauch and the appellant. Freking himself testified that he did not know the Brauch mortgages were not recorded until about September, 1931, when the question of giving August Kilker a second mortgage first arose. There is nothing in the record to disclose that Anna A. Brauch or the appellees knew that Freking had not fully revealed his financial status to August Kilker. The record shows that he had always been fair with Anna Brauch and told her all about his financial condition. As a reasonable person, she had a right to believe that, when he applied to August Kilker for a loan, he would be as fair and honest with him as he had always been with her. She had known of this loan to Anna Kilker and of Anna Kilker's death and the necessity for obtaining the money from some source to liquidate this debt due to the estate of Anna Kilker. It was William Kilker, the brother of August Kilker, who made the first suggestions, and whose son, Arthur, assisted in making the arrangements to obtain the loan from August. The Brauchs had nothing to do with it, except that, when Freking said to Anna that "he guessed he could get it from August Kilker", she merely replied that he should go there and get it of him and that she did not have the money. It does not appear from the record that August Kilker made any investigation as to the Frekings' financial standing, except to talk to Freking himself and to have the records in the recorder's

office examined in reference to mortgage liens. August Kilker did not reveal even to Freking that he was going to make an investigation of the records in the recorder's office. We set out a portion of August Kilker's testimony on this subject:

"Q. You didn't ask Mr. Freking when he said he was a little behind how far he was behind? A. No, sir.

"Q. Or who he owed? A. No.

"Q. Or how much? A. No, sir.

"Q. You didn't ask him for a property statement of any kind? A. No.

"Q. And all that Freking told you, as I understand it now, to get this straight, all he told you was this: That he was a little behind and he owed Will some money and he wanted to borrow of you, is that right? A. Yes, sir. And he owed some on the 80, Berg 80, that's all he had.

"Q. Is that everything he told you in connection with that loan, quite positive of that? A. That is what he told me, yes.

"Q. And what you went on in loaning this money, going down to the records, you found nothing? A. Yes."

In the case of Beechley v. Beechley, 134 Iowa, at page 76, 108 N. W. 762, 9 L. R. A. (N. S.) 955, 120 Am. St. Rep. 412, 13 Ann. Cas. 101, we said:

"But an estoppel in pais is based on fraud, and the conduct relied upon to establish it must be such as to amount to fraud, actual or constructive. There must be deception, and change of conduct in consequence thereof. * * * An estoppel by acts and declarations, or by silence, is defined by Bouvier in his Law Dictionary, 541, as follows: 'Such as arises from the acts and declarations of a person by which he designedly induces another to alter his position injuriously to himself.' "

See, also, Garretson v. Life Assn., 93 Iowa 402, at page 411, 61 N. W. 952.

Again this court said in Laub v. Trowbridge, Admr., 71 Iowa 396, at page 400, 32 N. W. 394:

"It is a fundamental rule of the law of estoppel in pais, as expressed in Lucas v. Hart, 5 Iowa 419, that 'the estoppel is allowed to prevent fraud and injustice, and exists wherever a party cannot, in good conscience, gainsay his own acts or assertions.' In other

words, the acts and admissions of a party operate against him where, in good conscience and honest dealing, he ought not to be permitted to gainsay them. The facts in cases of this kind, to be sufficient to authorize the application of the law of estoppel, always involve bad faith on the part of the party sought to be estopped from showing the truth."

As stated in 21 C. J. 1129:

"One relying on an estoppel must have exercised such reasonable diligence as the circumstances of the case require. If he conducts himself with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss, he cannot invoke the doctrine of estoppel."

The evidence in this case discloses that Henry H. Freking and wife had resided on their farm in the vicinity of LeMars for over forty years. August and William Kilker had also resided in that vicinity and had known the Freking family as prosperous and well-to-do farmers during a long period of years. August Kilker testifies that he had known the Frekings for forty-three years, and that he knew of the indebtedness owing to Mrs. William Kilker. It appears from the record that until the difficulty arose between these parties in the fall of 1931 the Frekings were trustworthy and apparently prosperous farmers, and always kept the interest on their indebtedness paid. Most of the money had been borrowed through Anna A. Brauch, who had some connection with, and for a time worked in, one of the banks at LeMars, and was a notary public. Whether the money she was loaning was in fact her own personal money, as claimed by appellant, or whether her brothers, Frank P. Brauch and Henry P. Brauch, appellees in this case, were permitting her to loan and handle money belonging to them or in which they had some interest, does not clearly appear from the evidence. It is claimed by the appellant that there was an agreement and understanding between the appellees, through Anna A. Brauch and Henry H. Freking, that the mortgages were to be withheld from the record. There is not a scintilla of evidence in the record to bear out this claim. Some time prior to March 5, 1931, one Holsman loaned Mr. Freking $10,000 and took a mortgage on the two hundred forty acres. Holsman failed to record his mortgage also. There is just as much reason to believe that there was an agree-

ment between Holsman and the Frekings to withhold his mortgage from the record as there is to support the claim that there was an agreement between the Frekings and Brauchs. The record is wholly lacking in anything which points to bad faith or a fraudulent purpose or design on the part of the appellees. It is claimed by appellant that Freking told August Kilker that the two hundred forty-acre farm was clear. As strong as Mr. Kilker would put this on cross-examination was: "That is what I understood." He was then asked the question: "Might you have been mistaken?" and he answered: "No, sir." Freking's version of this is shown by his testimony: "Q. Did August Kilker ask you if you had any mortgages when you borrowed the money? A. Not as I know of."

The estoppel is not claimed against the Frekings, but against the appellees, Frank P. Brauch and Henry P. Brauch, and no one claims that they had any knowledge or notice of the fact that August Kilker was making the loan to Henry H. Freking, except the knowledge which was imparted to their sister, Anna A. Brauch. These facts, to use the language of the court in Laub v. Trowbridge, Admr., supra, "do not authorize the conclusion that justice, good conscience, and the prevention of fraud require that" the appellees should not be permitted to recover on their mortgages as first and valid liens upon the real estate described therein.

It is further contended by appellant that the indebtedness owing to Anna Kilker antedated the acquisition of the homestead and that "a woman of the training and business experience of Anna Brauch would undoubtedly know of this fact and that it would be to her advantage to have the status thereof changed." However, we fail to find any evidence in the record that Anna Brauch or the appellees had any knowledge concerning the fact that the Kilker indebtedness antedated the acquisition of the homestead, or that the same was, or could be, claimed as a lien against the homestead property, and without such knowledge there can be no estoppel. The natural inference is that Anna A. Brauch and the appellees, knowing the homestead character of the property which was covered by the $3,800 mortgage, and having knowledge of the fact that is generally known that a homestead is exempt from ordinary debts, there would be no necessity of recording the $3,800 mortgage, in order to give notice to other creditors, as no injury could result to other creditors by reason of failure to record the same. At least the argument is not tenable that the mortgage on the homestead

property was withheld from the record for the purpose of inducing others to extend credit.

This leaves but the single question, in so far as the plea of estoppel is concerned: Does the failure of the appellees to record their mortgage amount to fraud against the judgment lien holders, and is this sufficient upon which to base an equitable estoppel?

In Baxter v. Baxter, 204 Iowa 1321, 217 N. W. 231, a chattel mortgage case, we said:

"If such withholding was under an arrangement to enable the obtaining of credit by the debtor, those who became creditors in ignorance thereof may avoid the transaction. Snouffer v. Kinley, 96 Iowa 102, 64 N. W. 770. On the other hand, mere failure to record will not amount to fraud against subsequent 'creditors'. In re Assignment of Lemert v. McKibben, 91 Iowa 345, 59 N. W. 207; In re Assignment of Bloomfield Woolen Mills, 101 Iowa 181, 70 N. W. 115; Groetzinger & Co. v. Wyman, 105 Iowa 574, 75 N. W. 512."

In the case In re Assignment of Bloomfield Woolen Mills, 101 Iowa 181, 70 N. W. 115, which involved a mortgage covering both real and personal property, at page 191 of said opinion, the court used this language:

"The mere fact that an instrument is not recorded at or near the time of its execution does not render it fraudulent. It only becomes so in virtue of some agreement or arrangement between the mortgagor and mortgagee which has for its purpose the protection of the mortgagor, in order that he may continue his business on a fictitious basis, and obtain credit which he could not otherwise receive. Such deceit requires the concurrence or connivance of both parties. The mere hope of the one or the neglect of the other will not amount to fraud. These rules are well settled, and require no citation of authorities in their support. But see Lemert v. McKibben, 91 Iowa 345, 59 N. W. 207, and cases cited."

Again in Grant v. Cherry, 199 Iowa 164, 201 N. W. 588, we said:

"As to the claim of estoppel arising from the fact that the deed was not recorded until after the judgment was rendered, it is plain that appellant did not extend credit to Lizzie on the strength

of her apparent ownership of the land. The deed was not withheld from record by any agreement or understanding with the grantor."

In the case of Rea v. Wilson, 112 Iowa 517, 84 N. W. 539, which was a contest between an attaching creditor and an unrecorded mortgage holder, this language was used:

"It is universally held that an unrecorded deed or mortgage takes precedence over a judgment or attachment lien, and the fact that the attachment or judgment lien holder has no notice of the prior instrument is entirely immaterial."

A judgment creditor is not a purchaser under the recording act contained in section 10105 of the 1931 Code. See Foster v. Hobson, 131 Iowa 58, at page 61, 107 N. W. 1101.

The evidence in this case falls far short of disclosing the necessary elements to constitute equitable estoppel against the appellees, and it follows from the foregoing that the appellant must fail in his plea of estoppel.

On the question argued by the appellant that the appellees are not the real parties in interest and not entitled to maintain this action, we have but to say that "it has uniformly been held by this court that under this provision of the Code [section 2544 of the Code 1873, now section 10968 of the 1931 Code], the party holding the legal title to a cause of action, though he be a mere agent or trustee, with no beneficial interest therein, may sue thereon in his own name. Cottle v. Cole, 20 Iowa 481; Rice v. Savery, 22 Iowa 470; Pearson v. Cummings, 28 Iowa 344; Knadler v. Sharp, 36 Iowa 232; Vimont v. Railway Co., 64 Iowa 514, 21 N. W. 9." Cassidy v. Woodward, 77 Iowa 354, at page 357, 42 N. W. 319. See, also, Barrett v. Chicago, Milwaukee & St. Paul R. R. Co., 190 Iowa 509, at page 520, 175 N. W. 950, 180 N. W. 670.

Another claim made by the appellant is that the original indebtedness to Anna Kilker, represented by the $4,000 note which was executed by H. H. Freking and wife, Mary E. Freking, in 1923, antedated the acquisition of the homestead by about one year, the homestead having been purchased in March, 1924, and the Frekings having moved thereon shortly thereafter, and, inasmuch as the $4,000 borrowed from August Kilker by Mr. and Mrs. Freking was for the purpose of paying, and was in fact used to pay, the note of Anna Kilker, representing a debt antedating the acquisition of the homestead, that the homestead is not exempt from the lien of the

appellant's judgment and that the lien of appellant's judgment is prior and superior to the $3,800 mortgage indebtedness of the lien held by Frank P. Brauch upon the homestead property. We do not find that our court has ever passed upon this precise question. The nearest case in point which we have been able to find is Johnson County Savings Bank v. Carroll, 109 Iowa 564, at page 574, 80 N. W. 683. In that case the question was whether the homestead was liable for a debt incurred after the acquisition of the homestead for money borrowed with which to pay a debt representing a portion of the purchase price of the homestead. In that case Justice Waterman, speaking for the court, said:

"There is another and broader ground upon which we might rest the conclusion on this issue. This indebtedness, having been incurred after the homestead right attached, although it was for money paid on the purchase price, would confer on the creditor no right to a lien. The statute (Code, section 2972) provides that the homestead is exempt from judicial sale, 'where there is no special declaration of statute to the contrary.' Section 2976 provides that it may be sold for debts created by written contract executed by those persons invested with power to convey, when the contract expressly stipulates that it is liable, and also for debts antedating its purchase. There is also a provision in section 2975 making it liable to mechanics' liens. These are the only statutory provisions on the subject. If we are to enforce liability in this case, it must be upon general equitable principles, and in the face of the prohibition of section 2972. We can discover no warrant for so doing. See Lee v. Murphy, 119 Cal. 364, 51 P. 549. We have held that the homestead may be sold for purchase-money indebtedness incurred at the time of the acquisition of the homestead right. But this was upon the express ground that such indebtedness did not accrue after the homestead was acquired; that, in effect, it was an antecedent obligation. Christy v. Dyer, 14 Iowa 438. In that case it is said: 'The legislature with a view of avoiding all constitutional questions, has made the exemption prospective, and not retrospective. When the homestead has been purchased, then, as to all subsequent debts, it is exempt; for all prior ones, it is liable.' The cases relied upon by appellee are all distinguishable in their facts from the one we have here. In each of them the indebtedness was incurred at the time the homestead right attached, while in the case at bar, as we have found, the homestead was acquired before the

loan by plaintiff was made. That this is a material distinction is sufficiently shown, perhaps, by the language of our own statute; but it is not out of place to say that it is elsewhere recognized. Ruhl v. Kauffman, 65 Tex. 728; Loftis v. Loftis, 94 Tenn. Sup. 232, 28 S. W. 1091; McCarty v. Brackenridge, 1 Tex. Civ. App. 170, 20 S. W. 997; Dresse v. Myers, 52 Kans. Sup. 126, 34 P. 349; Eyster v. Hatheway, supra. [50 Ill. 521, 99 Am. Dec. 537.] The constitution of Tennessee (article 11, section 11) provides, with relation to the homestead exemption: 'The exemption shall not operate against public taxes nor debts contracted for the purchase money of such homestead or improvements thereon.' In the Loftis case, to which attention has just been called, the court said, in construing this provision: 'The difficult and important question is presented in this case whether money borrowed from a third person to pay off the purchase money due the original vendor or his assignee is a debt or liability contracted for the purchase, in the sense of the statute and constitutional provision. * * * We think there is a marked difference between purchase money and money borrowed to pay off purchase money, and that a debt or liability contracted for the purchase of land means a debt which has for its immediate and original consideration such purchase. So long as the original consideration of the debt remains,—the purchase of the land,—the homestead cannot prevail against it, even though the debt be assigned, renewed, or extended. * * * But, when the original purchase money is paid by the use of other money borrowed from a third person for that purpose, the consideration of the debt incurred for borrowed money is not superior to the homestead. If we hold that money borrowed to pay off the purchase money must be held superior to the homestead, then it logically follows that money borrowed to pay off such borrowed money must also be held superior, and this rule must continue through as many removes and borrowing transactions as the needy debtor may be forced to make through a series of years. * * * This would not be a sound rule.' "

The reasoning found in the foregoing case applies with equal force to the question in the case at bar. A new and independent indebtedness was created based upon an entirely new and different consideration, when August Kilker loaned money to H. H. Freking and wife, and the Frekings executed a note therefor. It was not the original debt between the Frekings and Mrs. William Kilker, but a new debt, created by a new contract between Mr. and Mrs.

Freking and August Kilker, and, when the original note, representing a debt for borrowed money which antedated the homestead is paid "by the use of other money borrowed from a third person for that purpose, the consideration of the latter debt incurred for borrowed money is not superior to the homestead right".

It is claimed by appellant that there was a confidential relationship existing between Anna Brauch and H. H. Freking, but we have examined the record carefully, and we find nothing to. sustain this contention. He also claims that, because Anna Brauch was in the court room and was not called as a witness, that this should be considered against the appellees. There seems to be no dispute about any of the facts that were brought out by the testimony of the witnesses in the trial, and there was no occasion for Anna Brauch taking the witness stand. The appellees introduced no evidence in rebuttal.

Many other legal propositions are argued by appellant, but we find no support in the record to bear out his contentions, and it would serve no useful purpose to refer to them specifically. We have given careful consideration to all of the appellant's contentions, and are abidingly satisfied that the trial court was right in rendering judgment and decree in favor of plaintiffs and in dismissing appellant's cross-petition, and that its action in so doing should be, and is hereby, affirmed.—Affirmed.

ANDERSON, C. J., and KINTZINGER, DONEGAN, MITCHELL, PARSONS, and POWERS, JJ., concur.